James W. Walker (TX Bar No. 20709600)   Gary H. Leibowitz (Admitted *pro hac vice*)
Ian Ross Phillips (TX Bar No. 24091239)   Irving E. Walker (Admitted *pro hac vice*)
**COLE SCHOTZ P.C.**   H.C. Jones III (Admitted *pro hac vice*)
901 Main Street, Suite 4120   **COLE SCHOTZ P.C.**
Dallas, TX 75202   300 E. Lombard Street, Ste. 1450
469-557-9390 Telephone   Baltimore, MD 21202
469-533-1587 Facsimile   410-230-0660 Telephone
jwalker@coleschotz.com   410-230-0667 Facsimile
iphillips@coleschotz.com   gleibowitz@coleschotz.com

*Attorneys for the Hon. Russell F. Nelms (Ret.) as Litigation
Trustee for The Think Finance Litigation Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| THINK FINANCE, LLC, *et al.*,[1] | Case No. 17-33964-hdh11 |
| Debtors. | (Joint Administration) |
| ------------------------------------------------------- | |
| THE HONORABLE RUSSELL F. NELMS (RET.), LITIGATION TRUSTEE FOR THE THINK FINANCE LITIGATION TRUST, | Adversary Case No. 20-03099-hdh |
| Plaintiff, | |
| v. | |
| ELEVATE CREDIT, INC., | |
| Defendant. | |

## AMENDED COMPLAINT TO AVOID AND RECOVER TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550, AND §§ 24.001 *ET SEQ*. OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT

The Honorable Russell F. Nelms (Ret.) (the "**Trustee**" or "**Plaintiff**"), as Litigation

Trustee for the Think Finance Litigation Trust (the "**Trust**"), created pursuant to the confirmed

---

[1] The Debtors are: Think Finance, LLC (3098), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949).

plan in the jointly administered Chapter 11 cases of Think Finance, LLC, *et al.* (the "**Debtors**"),[2] by the Trustee's undersigned counsel, hereby files this Amended Complaint against Elevate Credit, Inc. ("**Elevate**" or "**Defendant**"), and respectfully represents as follows:

## INTRODUCTION

1.      This case stems from the dramatic rise of a fraudulent internet lending enterprise that generated billions of dollars in revenue by utilizing what federal and state prosecutors refer to as an illegal "rent-a-tribe" scheme in an attempt to avoid state usury laws, and charge interest rates as high as 400% to consumer borrowers in dire need of short term loans, by exploiting Indian Tribal Sovereign Immunity.  The consumer borrowers were often financially devastated under the burden of the exorbitant interest rates.

2.      The illegal rent-a-tribe scheme worked as follows: a consumer borrower applies for a loan on the internet and is immediately approved.  The loan is then funded through a Native American Indian Tribe which obtained the funds from a credit source the Debtors provided.  A joint venture between an investment fund, Victory Park Capital ("**VPC**"), and the Debtors, referred to as "GPLS", then purchased approximately 99% of the participation interests in the loan within 48 hours.  The tribe was left with approximately 1% of the interests, less the agency and service fees charged by the Debtors as well.  The tribe was made to look like the lender, but it was the Debtors and their affiliates that were the true lender.

3.      The scheme created massive contingent and actual liabilities as numerous federal and state regulators, and consumer borrower tort claimants, investigated and prosecuted claims

---

[2] Under § 5.3 of the Debtors' confirmed Second Modified Amended Plan of Reorganization ("**Plan**"): (i) the Think Finance Litigation Trust was established on the effective date of the Plan, (ii) this case and other causes of action specified in the Plan were transferred and assigned to the Trust, (iii) the Honorable Russell F. Nelms (Ret.) was appointed to serve as the Litigation Trustee, and (iv) the Litigation Trustee on behalf of the Trust was substituted in for the Committee as the Plaintiff to take over the prosecution of all cases.  In addition, under the Plan, the Trustee shares the attorney-client privilege with the "Reorganized Debtor."

against the Debtors and their officers, directors, investors and other participants alleging civil RICO violations, violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act, state usury statute violations, tort claims, and breaches of fiduciary duties, among others, seeking billions of dollars in damages (the "**Legacy Liabilities**").

4.     When the tribal lending industry in which the Debtors operated began to collapse under the weight of similar claims against its competitors, including CashCall/Western Sky and AMG, the Debtors' officers and directors realized the end of their predatory practices was near. With the intent to hinder, delay, and/or defraud the Debtors' creditors, the Debtors transferred to a newly formed entity, Elevate, the most valuable assets of the Debtors consisting of all of the assets of the Debtors' direct lending businesses which did not involve the Native American tribes used by the Debtors in their rent-a-tribe operations. This transfer rendered the assets out of the reach of creditors through a purported tax-free spin-off and left the Debtors holding the Legacy Liabilities.[3] Elevate paid $0.00 to the Debtors in consideration for the hundreds of millions of dollars in assets it received.  In addition, after the Debtors transferred their most valuable business assets to Elevate, the Debtors' insiders and shareholders, which included certain officers and directors, received all of Elevate's stock and the Debtors' cash dividends.

5.     Less than 18 months later, Elevate filed its S-1 and subsequently conducted a successful Initial Public Offering ("**IPO**"), and has generated billions of dollars in revenue since the spin-off.  The Debtors, however, were left grossly undercapitalized and without sufficient assets to pay their debts, and were burdened with the Legacy Liabilities.  The spin-off left the Debtors spiraling into an inevitable bankruptcy, and its creditors with no adequate way to recover on the Debtors' obligations.

---

[3] Scott Tucker, the founder of AMG Services was convicted of making illegal payday loans and racketeering in October 2017 and is currently serving a sentence of 16 years and 8 months in federal prison.

6.     The inception of the Debtors' fraudulent lending scheme dates back more than a decade.  Prior to rebranding itself in 2010, "Think Finance, Inc." was known as "ThinkCash, Inc.", and it operated as an on-line payday lending website rather than through a "brick and mortar" lending store.  Ken Rees ("**Rees**") was the Chief Executive Officer and Chairman of the Board of ThinkCash, Inc. ("**ThinkCash**").

7.     ThinkCash provided short-term installment loan products with funding from the First Bank of Delaware (a federally chartered bank) from its formation through 2010.  The interest charged to its consumer borrower customers far exceeded the state usury laws where the loans were being offered.  Federal regulators, including the Federal Deposit Insurance Corporation ("**FDIC**") and Department of Justice ("**DOJ**"), put a stop to the practice and what became commonly referred to as an illegal "rent-a-bank" scheme.  The First Bank of Delaware was ultimately shut down and required to pay millions in civil penalties.

8.     Despite the loss of its funding source, and the potential liabilities accruing from the rent-a-bank model, the enterprise looked for ways to continue offering short-term installment loan products through the internet at usurious rates to maintain its hefty stream of profits.

9.     In an attempt to evade federal and state lending laws and regulators once again, Rees and ThinkCash decided to switch to the rent-a-tribe model already being used by CashCall, Inc. ("**CashCall**") and AMG Services, Inc. ("**AMG**").  Rees even obtained legal advice from CashCall's banking/regulatory counsel, and met with tribal leaders who worked with CashCall, to surreptitiously learn the business model.  He then approached members of the Chippewa Cree Tribe and Otoe-Missouria Tribe, and later the Tunic Biloxi Tribe, (collectively, the "**Tribes**") for the purpose of establishing a "rent-a-tribe" enterprise.

10. In an attempt to cloak its dark past, ThinkCash renamed the company Think Finance, Inc. ("**Old Think Finance**"). Beginning in 2011, it helped establish and control the operations of Plain Green, LLC ("**Plain Green**"), and Great Plains, LLC ("**Great Plains**"), and later "**MobiLoans**" — the tribal enterprises that served as fronts to disguise Old Think Finance's roles in the lending model and to ostensibly shield the scheme from liability. Pursuant to this scheme, Old Think Finance made loans with annual percentage rates in excess of 400%—far in excess of the interest cap in every state that has usury laws.

11. Upon information and belief, the companies also obtained initial funding for the Tribes which had little or no money to lend, secured revisions to the tribal laws, and located banks for electronic fund transfer services to promote the scheme. The companies further assigned the Tribes pre-registered trade names and URLs, and provided them access to its underwriting algorithm. Furthermore, upon information and belief, the companies provided the Tribes certain collection, servicing, marketing, and human resource services to facilitate the Tribes' entry into this market.

12. After generating billions of dollars in revenue with the rent-a-tribe scheme, the illegal model came under well-publicized and heavy attack in the lending industry in 2012-2013 by the FDIC, Department of Justice ("**DOJ**"), Securities and Exchange Commission ("**SEC**"), various state regulators, and the newly created Consumer Finance Protection Bureau ("**CFPB**"), endangering Old Think Finance's goal of an initial public offering. Major competitors in the industry, including CashCall and AMG, were prosecuted through complaints seeking hundreds of millions of dollars in penalties and damages, and even criminal indictments in some cases. Automated Clearing House ("**ACH**") processors were also ordered by the FDIC and other regulators including the New York Department of Financial Services ("**NYDFS**") to cease and

desist all electronic fund transfers for entities involved in tribal lending. In addition, the consumer borrowers began to complain of being defrauded and notified their state attorney general and organized for class actions. In the face of this scrutiny and fearing prosecution for its role in the scheme, VPC decided to abandon Old Think Finance and stop purchasing loans from the Tribes through its GPLS vehicle.

13. In an attempt to save its lucrative cash stream, Old Think Finance delayed the regulators at every turn. It hired Martin Wong as a "Chief Integrity Officer" to deal with the regulators, helped form a trade association called "NAFSA", and hired lobbyists to protect its scheme. It even assisted the Otoe-Missouria Tribe behind the scenes in an action the Tribe filed in New York against the NYDFS challenging the agency's "Operation Chokepoint" and its related attempt to stop tribal lending schemes in New York by prosecuting the ACH processors that serviced the industry.

14. But the need to evade the Legacy Liabilities was underscored when the CFPB and at least a half-dozen states issued "Confidential Information Demands ("**CID's**") to hundreds of participants nationwide in rent-a-tribe schemes including Plain Green, Great Plains, MobiLoans and GPLS. Old Think Finance knew it had to find another source of revenue quickly. Accordingly, Old Think Finance conceived and launched RISE, a legal, state-licensed lending business, which used the Old Think Finance's valuable proprietary technology platforms and intellectual property, along with the institutional knowledge and experience of its employees. RISE quickly started generating millions of dollars in revenue.

15. Seeing the impending doom of its tribal lending business, Old Think Finance decided to jettison the toxic Legacy Liabilities in an attempt to make a clean break. Old Think Finance devised a fraudulent scheme to escape its usurious past and attempt to place its valuable

state-licensed and legal lending platform and assets beyond the reach of the CFPB, federal and state regulators, consumer borrowers, tort claimants, and other creditors.

16.     First, Old Think Finance would isolate the Legacy Liabilities by transferring the assets, businesses, and operations known as the Elastic, Payday One, Resta, Rise, and Sunny-branded products loan platforms and related assets (collectively, the "**RISE Assets**") out of Old Think Finance and into a new clean entity. Second, Old Think Finance would completely sever the tribal lending business and the Legacy Liabilities from Elevate in an attempt to separate the valuable state-licensed direct lending businesses from the reach of the Legacy Liabilities. Third, in a final spasm borne of hubris and greed, Old Think Finance would siphon off to its shareholders, who were now also the owners of Elevate's stock, the remaining approximate $59 million in cash Elevate had left behind to contribute to the fiction of the tax-free spin-off.

17.     The process was code named "Project Exclaim." Old Think Finance formed the entirely new entity, Elevate, on January 31, 2014 in Delaware. In May 2014, Old Think Finance transferred to Elevate all of the Rise Assets, software, technology, and other intellectual property, and other proprietary information and assets used in connection with or related to Old Think Finance's direct, non-tribal, lending business and operations (collectively, the "**Transfers**"). Elevate also hired several key high-level executives from Old Think Finance. Rees became the CEO and Chairman of the Board for Elevate, yet he remained Chairman of the Board for Old Think Finance for a period of time. The companies shared other Board Members as well. Chris Lutes ("**Lutes**"), the CFO of Old Think Finance and Elevate, and Sarah Cutrona, the General Counsel for Old Think Finance and Elevate ("**Cutrona**"), served in their respective capacities for both companies for a period of time before moving exclusively to Elevate.

18.     Elevate did not assume a single dollar of the Legacy Liabilities from Old Think Finance's tribal lending and other businesses. These toxic liabilities remained with Old Think Finance.

19.     The transaction closed on or about May 1, 2014. Through these corporate machinations, Old Think Finance was stripped of its most valuable assets and its go forward legal business. All that remained in Old Think Finance was the illegal tribal lending business that was winding down, and the consumer borrower and regulatory claims that exceeded a billion dollars.

20.     Rees and the other officers and directors conspired in an attempt to make the spin-off appear legitimate and to fend off any subsequent fraudulent transfer claims. CBIZ was retained by Old Think Finance to provide a "Valuation Analysis" and "Solvency Opinion" for both Think Finance and Elevate, and KPMG was retained to provide an opinion about the tax consequences of the spin-off. Old Think Finance was clearly opinion shopping.

21.     Old Think Finance lied and intentionally concealed the Legacy Liabilities and all of the contingent liabilities from CBIZ to falsely inflate its valuation, and even went so far as to instruct CBIZ to include specific conclusions, in a vain attempt to withstand fraudulent transfer scrutiny. The KPMG opinion, however, relied on the Legacy Liabilities and the contingent liabilities to satisfy the requirements under the IRS Code for the transaction to be treated as a tax-free spin-off. The substance of the opinions and conclusions desired by Old Think Finance dictated entirely the information it provided to both CBIZ and KPMG.

22.     The incestuous and conflicted nature of officers and directors for the companies in the spin-off enabled Old Think Finance to unilaterally dictate the terms of the deal, avoid third-party due diligence, and eliminate standard representations and warranties regarding its massive

Legacy Liabilities. Again, Elevate paid $0.00 to Old Think Finance in consideration for the assets received, and the spin-off allowed Old Think Finance to be used as what the executives internally called a "dividend play".

23. As part of the scheme to divert assets, Old Think Finance also knowingly distributed approximately $59.0 million to its shareholders over the next 18 months, including Rees, Lutes, and Cutrona, even though it had never made distributions to shareholders before, and the regulators and consumer borrowers had filed lawsuits seeking hundreds of millions if not billions of dollars in damages, fines and penalties. After deliberation, the officers of both Elevate and Think Finance intentionally concealed the dividend payments from the Attorney General for the Commonwealth of Pennsylvania because they had requested that Elevate be dismissed from the lawsuit filed by the Commonwealth, and they did not want to jeopardize the dismissal.

24. The Debtors' scheme not only segregated billions of dollars of regulatory and consumer borrower claims from the valuable assets, but it stripped $246.0 million from the business on a tax free basis on the way out as Elevate and its insiders left Old Think Finance to collapse.

25. The scheme achieved the perpetrators' goals, as Elevate's revenues continued to soar. Less than 3 years after the spin-off, Elevate went public on or about April l6, 2017 and Rees brazenly rang the opening bell at the New York Stock Exchange. Officers, directors and shareholders of Old Think Finance received millions in distributions, and shares of Elevate's publicly traded stock. The creditors, however, were left holding an empty bag.

26. The many consumer borrower investigations led to putative classes in Virginia, Florida, California, Vermont, and North Carolina filing suit against Old Think Finance, Rees,

GPLS and other affiliates, co-conspirators, investors and participants in the scheme alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. §§ 1961-1968 and state law violations.  These various claimants alleged that the defendants acted in concert and conspired with each other to repeatedly violate federal and state lending statutes resulting in the collection of an unlawful debt from the class members.  They also alleged violations of state usury statutes and sought to void the underlying loans.  Because of their roles in the enterprises, the CFPB and the Attorney General for the Commonwealth of Pennsylvania brought enforcement actions against Old Think Finance, Rees and most of the other insiders.

27.     While the spinoff from the Legacy Liabilities allowed Elevate to go public on April 11, 2017, it left Old Think Finance doomed to fail.  Overburdened with Legacy Liabilities and debt, stripped of its funding source (VPC) and necessary cash, and facing prosecution from regulators and consumer borrowers, Old Think Finance was destined for bankruptcy.

28.     Just prior to filing bankruptcy, Old Think Finance, the company that fraudulently transferred the assets to Elevate, restructured its enterprise one last time, presumably to again try to fraudulently move other assets out of the companies and away from the reach of creditors. Management converted Old Think Finance from a corporation to a limited liability company called "Think Finance, LLC" (along with Old Think Finance, hereinafter referred to as "**Think Finance**"), with a newly formed parent holding company owning the membership interests.  It then filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "**Court**") on October 23, 2017 (the "**Petition Date**").

29.     Think Finance knew that it was doomed to fail the moment Elevate's spin-off was finalized as demonstrated by the following:

   i.   Think Finance rushed to complete the spin-off after federal and state regulators issued the CIDs, ordered ACH processors to cease and desist, and prosecuted CashCall, AMG and other tribal lending competitors.  The Tribes also lost their challenge to the NYDFS's Operation Chokepoint in New York state court and on appeal;

   ii.   Afraid of being prosecuted for its role, VPC, through GPLS, stopped purchasing new tribal loans and funding the scheme.  Drawing upon this contact, Think Finance asked VPC, its sole funding source, to instead fund a credit facility for Elevate and the RISE Assets;

   iii.   Think Finance lied and concealed the Legacy Liabilities from CBIZ after it hired CBIZ to perform a valuation and solvency analysis for Think Finance and Elevate.  It also (i) obtained exact language from its shareholders' counsel to insert into the analysis; and (ii) prepared talking points to answer questions from consumers and the press which concealed the regulatory impact on the enterprise;

   iv.   While Think Finance was concealing the Legacy Liabilities from CBIZ and the public, it disclosed the regulatory upheaval and need to exit the tribal lending industry in its Board Minutes and Memos, and to KPMG in order to obtain a positive tax opinion for the spin-off.  But it failed to tell KPMG that Rees would continue as Chairman of the Board for both companies, or that Think Finance would turn into a dividend play and distribute the remaining cash rather than use it to continue in business, as required under the IRS Code;

   v.   Elevate received at least $246.0 million of assets (although CBIZ failed to include the IP in the valuation) stripping the most valuable assets from the companies, leaving only approximately $59.0 million in cash which could never service the billions of dollars of Legacy Liabilities;

   vi.   Knowing that Think Finance could not survive in a dying illegal industry, the CEO, CFO, General Counsel, and most of the top executives left and went to work for Elevate.  Their replacements were left solely to delay the wind down long enough to try to satisfy the "continuity of business" requirement under the IRS Code for a spin-off to remain tax free and protect the shareholders from taxes; and

   vii.   Think Finance even agreed to unusual indemnification agreements with certain directors and shareholders purporting to shield them from liability for their role in the spin-off, and then, months later, backdated

indemnification agreements for officers including Lutes and Wong to the date of the spin-off to prepare for the expected litigation.

30. Think Finance was left with placeholder officers and directors, mountains of debt, insufficient cash, no funding, no legal business model, and CID's and massive lawsuits to defend.

## JURISDICTION AND VENUE

31. This adversary proceeding arises out of and is related to the above-captioned Bankruptcy Case before the Court. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

32. This adversary proceeding is brought pursuant to Rule 7001, *et seq.* of the Bankruptcy Rules and §§ 544 and 550 of the Bankruptcy Code. The Trustee consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

33. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this adversary proceeding arises under and in connection with a case under the Bankruptcy Code which is pending in this District.

34. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O)

35. The Trustee has standing to pursue this Complaint.

## RESERVATION AND RIGHT OF AMENDMENT

36. During the course of this adversary proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers of an interest of the Debtors in property to Elevate that may be recoverable under the Fraudulent Transfer Laws. It is the Trustee's intention to

avoid and recover all such transfers made by the Debtors or utilizing the property in which the Debtors had an interest from any immediate or intermediate transferee of Elevate to the fullest extent permitted by the Bankruptcy Code.  The Trustee reserves the right to amend this Amended Complaint to include: (i) further information regarding the Transfers identified herein; (ii) additional transfers; (iii) modifications of and/or revisions to the Defendant's name; and (iv) additional defendants and/or additional causes of action (collectively, "**Amendments**"), that may become known to the Trustee, at any time during this adversary proceeding, through formal discovery or otherwise, and for such Amendments to relate back to the filing of the original Complaint.

## <u>PARTIES</u>

37.    Pursuant to § 5.3 of the confirmed Plan, the Trust was established on the effective date of the Plan; the causes of action asserted herein, which previously were causes of action held by the Debtors' bankruptcy estates, were transferred and assigned to the Trust.   The Honorable Russell F. Nelms (Ret.) was appointed to serve as the Litigation Trustee for the Trust. Under the confirmed Plan, the Trustee has standing to prosecute the claims asserted in this Complaint on behalf of the Trust and has all the "strong arm" powers of a trustee under § 544 of the Bankruptcy Code.

38.    Pre-confirmation, on or about October 15, 2019, Elevate and the Official Committee of Unsecured Creditors (the "**Committee**") entered into an initial tolling agreement,[4] tolling the deadline for claims against Elevate to be asserted, from October 22, 2019 through and including January 15, 2020 (as amended, the "**Deadline**").  On January 10, 2020, the Trustee and

---

[4] Stipulation and Order by and between the Official Committee of Unsecured Creditors and Elevate Credit, Inc. Tolling All Applicable Statutes of Limitations with respect to Causes of Action including Avoidance Actions [Docket No. 1559] (hereinafter, referred to as the "**First Tolling Agreement**", with each successive such agreement referred to as the "**Second Tolling Agreement**", the "**Third Tolling Agreement**", the "**Fourth Tolling Agreement**", and the "**Fifth Tolling Agreement**").

Elevate submitted the Second Tolling Agreement to further extend the Deadline through and including March 20, 2020, which the Court entered on January 14, 2020 [Docket No. 1700]. On March 18, 2020, the same parties submitted the Third Tolling Agreement to further extend the Deadline through and including May 29, 2020, which the Court entered on March 18, 2020 {Docket No. 1742]. On May 26, 2020, the Trustee and Elevate submitted the Fourth Tolling Agreement to further extend the Deadline through and including June 30, 2020, which the Court entered on May 28, 2020 [Docket No. 1757]. On June 24, 2020, the same parties submitted the Fifth Tolling Agreement to further extend the Deadline through and including August 14, 2020, which the Court entered on May 28, 2020 [Docket No. 1757]. In accordance with the terms of the Fifth Tolling Agreement, the Trustee filed the Complaint initiating this adversary proceeding before the expiration of the Deadline. The Complaint therefore was timely filed.

39. Old Think Finance is a Delaware corporation with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001. Rees and others created Old Think Finance to locate, arrange and funnel lending capital to the Tribes used to make the usurious loans to consumers. Although the Tribes held themselves out as the actual lender of these internet loans, Old Think Finance was the actual entity that procured the investment capital for the Tribes. Additionally, Old Think Finance initially performed the application processing, underwriting, and customer service support for the loans, but some of these tasks were later delegated to the other companies identified herein. Old Think Finance is the lead debtor in the bankruptcy cases. Under Section 3.6 of the Plan, the Nationwide Consumer Borrower Settlement Class received an allowed $1.13 billion claim against Old Think Finance and its co-debtors for voting and distribution purposes. Old Think Finance, shortly before filing for bankruptcy relief, restructured itself to become a limited liability company under Delaware law.

40.     Debtor Think Finance SPV is a limited liability company formed under the laws of Delaware with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. According for the Application for Registration submitted to Secretary of State of Texas, Think Finance SPV's stated business purpose is "managing, marketing, making, and servicing consumer credit products." This document was signed by Rees as President.

41.     Debtor Tailwind Marketing is a limited liability company with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. Tailwind participated in the enterprise as the marketing and technology arm to disguise the involvement of Rees and Think Finance. According to the Application for Registration submitted to the Secretary of State of Texas in 2008, Tailwind Marketing's stated business purpose was to "provide marketing and consumer financial services." This Application for Registration was signed by Rees as "the President of TC Loan Service, LLC," the Sole Member of Tailwind Marketing.

42.     Debtor TC Loan Services, LLC is a limited liability company with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. TC Loan Services participated in the enterprise as the controlling member of Tailwind Marketing. TC Loan Services was created to further insulate Defendants from liability by adding an extra layer of corporate protection to the misconduct of Tailwind Marketing.

43.     Debtor TC Decision Sciences, LLC ("**TC Decision Sciences**"), is a Delaware corporation with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. TC Decision Sciences participated in the enterprise as the website operator and software administrator for Plain Green and Great Plains

44.     Defendant Elevate is a financial technology (or "FinTech") company founded on January 31, 2014, that has employed over 500 people.  It provides non-prime loans to cash-strapped consumer borrowers through the internet.  It has originated $5.9 billion in non-prime credit to more than 2 million consumers to date.  It is based out of 4150 International Plaza #300, Fort Worth, TX 76109 and is publicly traded on the NYSE as "ELVT".

### FACTUAL BACKGROUND

I.      **Think Finance Creates Massive Legacy Liabilities through its Fraudulent and Illegal Rent-a-Tribe Scheme.**

45.     For more than eight years, Think Finance operated a usurious lending scheme which sought to evade the usury laws of states nationwide by using Native American Indian Tribes as the conduits for their loans.  Although regulatory enforcement efforts and private lawsuits uncovered the misconduct as early as 2012, Think Finance continued to engage in the scheme even though "[n]o one appear[ed] to seriously dispute" that these rent-a-tribe "loans violated a host of state and federal lending laws."[5]

46.     Rees, the former Chairman of the Board and CEO of Think Finance, is one of the architects of the rent-a-tribe lending model—one of the few yet to be imprisoned for his role in this industry.[6]

47.     Prior to the rent-a-tribe model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws—a tactic known as "rent-a-bank."[7]

---

[5] *Hayes v. Delbert Servs. Corp.,* 811 F.3d 666, 669 (4th Cir. 2016); *see also Gingras v. Think Fin., Inc.,* 922 F.3d 112, 128 (2d Cir. 2019) (describing Plain Green as "payday lending entity cleverly designed to enable Defendants, including TCV, to skirt federal and state consumer protection laws under the cloak of tribal sovereign immunity.").

[6] *See United States v. Neff,* No. 18-2282, 2019 WL 4235218, at *1 (3d Cir. Sept. 6, 2019) (affirming the convictions of Hallinan and Neff, whose "RICO convictions [were] based on their efforts to skirt state usury laws by partnering with American Indian tribes to offer usurious payday loans."); The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018).

48.     Think Finance initially used a rent-a-bank lending model.  Under this arrangement, loans were originated in the name of First Bank of Delaware, but it served as nothing more than a nominal lender on behalf of ThinkCash.  In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans.

49.     The FDIC took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist order requiring it to terminate its relationship with "all third-party lending programs."  In response to the crackdown on rent-a-bank arrangements, several payday lenders reincarnated the lending model through associations with Native American Indian Tribes in an attempt to evade state laws and create a new tribal lending industry.  Like the rent-a-bank format, the loans would be originated in the name of a tribe, but the tribe would serve as nothing more than a nominal lender.

50.     After receiving notice of intent to terminate the rent-a-bank relationship, Think Finance "assembled the executive team together that weekend to look at a wide variety of things to do."  According to Rees, Think Finance evaluated "opportunities in the UK," as well as "tribal" lending, which was "something [Think Finance] hadn't really evaluated in the past."

51.     As part of this evaluation, Think Finance researched "other tribal lending businesses."  According to Rees, Think Finance "had a business model" that "worked well" with First Bank of Delaware, and it wanted its tribal lending arrangement "to replicate that as much as possible."  Representatives for Think Finance, including Rees and Cutrona, even met with Butch Webb of CashCall (a competitor in the tribal lending industry) in or around November 2010 to learn about the rent-a-tribe model.

---

[7] *See, e.g.,* Jean Ann Fox & Edmund Mierzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp., Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http:// www.consumerfed.org/pdfs/paydayreport.pdf.

52. Rees and Think Finance began vetting potential tribal partners and identified the Otoe-Missouria Tribe as a potential candidate. As part of this process, Think Finance created a PowerPoint entitled "Emergency Cash Lending—A New Source of Tribal Revenue." The PowerPoint claimed that "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue" and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." The "[t]urn-key solution include[d] technology, marketing, risk management, compliance support, and access to capital funding," which could be "[u]p and running 90 days from signed contracts."

53. Think Finance's presentation further explained that "[u]sing Think Finance technology and services," would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." The primary sources of this revenue were "[e]mergency cash users—mainstream Americans," who were "65% female," with household income of "$25K-50K" who primarily needed the emergency loans for unexpected bills, medical costs, car repairs, or to avoid overdrafts. Think Finance helped the tribe form Great Plains to participate in the scheme. The scheme was so unconscionable and predatory that the respective tribes barred their members from obtaining the loans.

54. Think Finance also worked with the Chippewa Cree tribe to form Plain Green.

55. Consistent with the business model, Think Finance created, developed, implemented and controlled the lending businesses it established under the front of tribal lenders. By way of example, Billi Anne Raining Bird, the former CEO of Plain Green, testified in a legal proceeding under oath that: (i) she agreed with the Claimants' characterization that Plain Green was a "rent-a-tribe," (ii) Plain Green had no meaningful role in the lending program other than

*pro forma* review of recommendations from Think Finance, (iii) Think Finance handled every material aspect of the lending program, including marketing, underwriting, origination, servicing, funding, and collection of the loans, and (iv) Think Finance intentionally tried to conceal information from Plain Green so that it was dependent on Think Finance, which could then continue to demand the vast majority of the profits from the lending business.

56.     Needing a source of funds, Think Finance agreed to collaborate with VPC to "create a new structure to avoid banking regulatory issues and leverage the company's existing sourcing, underwriting and servicing platforms" in a structure that "is substantially similar to the business model used by CashCall for over 9 months."

57.     Think Finance, GPLS, and the Tribes entered into a series of contracts that provided Think Finance with control of the operations and entitled it to retain the overwhelming majority of the profits, including: (i) the Participation Agreement between GPLS and Great Plains dated May 25, 2011; (ii) the Administrative Agency Agreement between GPLS and TC Administrative dated February 28, 2011; (iii) the Servicing Agreement between Great Plains and TC Decision Sciences dated May 25, 2011; (iv) the License and Support Agreement between Great Plains and TC Decision Sciences dated May 25, 2011; and (v) the Marketing Agreement between Great Plains and Tailwind Marketing dated May 25, 2011.

58.     The enterprise generated billions of dollars of revenue. Rees, Lutes, Cutrona, and other officers received millions of dollars in pay and distributions. While the enterprise experienced "tsunami-like growth" with run rates in excess of $500 million, the scheme was short lived.

## II. Think Finance Realizes the Regulators Have Uncovered the Scheme.

59.     The CFPB began its prosecution by issuing CIDs to the tribal entities and others. As early as April 19, 2012, two years before the spin-off, Rees had informational meetings with the CFPB about its investigation into the tribal lending industry.  Think Finance's Board Memos memorialize numerous discussions about the CFPB's actions.  Claudia Callaway, Esquire, of Katten Muchin Rosenman LLP ("**Callaway**"), Think Finance's outside counsel who also served as counsel for CashCall, emailed Cutrona on April 10, 2012 stating "Note the RICO class action against Scott Tucker" and providing a copy of the complaint.

60.     Although August, 2012 "resulted in the best financial performance in the company's history," the federal and state regulators were closing in.  CIDs were also issued by agencies in New York, Arkansas, Minnesota and Massachusetts, and in October, 2012 the Tribes began to beg Think Finance for help in addressing the numerous allegations of the various agencies.

61.     By November 2012, the company's Board Memos reflect thorough and panicked discussions about the regulatory issues engulfing the tribal lending industry, and the prosecution of the "Western Sky" / CashCall rent-a-tribe scheme by the FTC and CFPB for RICO violations.

62.     With projections in December, 2012 showing "$850MM+" in revenue, Think Finance began taking evasive actions in the face of the regulatory threats.  Think Finance hired lobbyists to advocate for its cratering industry and traveled to far-away places including Abu Dhabi to try to find new investors to replace VPC which had become skittish and stopped funding the operation.

63.     On or about December 20, 2012, Think Finance produced an internal PowerPoint presentation to try to circumvent prosecution entitled "Strengthening the Tribal Model" which

included emergency action points on what processes they should change: (i) to avoid the "True Lender" and "Aiding and Abetting" arguments of the various Attorney Generals for the illegal scheme; and (ii) to stop the automatic end of day funding and strengthen tribal involvement.

64. On or about February 7, 2013, Think Finance personnel admitted through internal emails that they were "concerned about the large number of issues" they had come across with respect to their "support of the tribal lenders" and employees were to be instructed to always state that the Tribes were the actual lenders.

65. From March 27, 2013 to April 18, 2013, Think Finance assembled a "No Lend" list which included fourteen (14) states that were actively seeking to prosecute those involved in rent-a-tribe schemes, so it could cease lending in those states by the end of April. Think Finance elected to quickly exit 20-25% of its U.S. coverage. But it continued the predatory lending business in states it perceived as less inclined to criminal prosecution.

66. On or about March 28, 2013, one of its tribal lending partners, Great Plains Lending, LLC, was named as a defendant in a class action in North Carolina, but it was dismissed as the plaintiffs mistakenly believed it was an affiliate of the CashCall/Western Sky scheme instead of the Think Finance scheme. Think Finance knew that it could not rely upon this type of mistake for long.

67. To defend the deluge of regulatory issues and investigations, Think Finance hired Martin Wong as Chief Integrity Officer in April 2013.

68. On or about April 30, 2013, a CID was served on GPLS by the CFPB. The CID expressly states:

> Purpose is to determine whether small-dollar online lenders or other unnamed persons have engaged or are engaging in unlawful acts or practices relating to the advertising, marketing, provision or collection of small dollar loan products in violation of Section 1-036 of the Dodd-Frank Wall Street Reform And Consumer

Protection Act, 12 U.S.C. § 5536 the Truth in lending Act, 15 U.S.C. §§ 6802-6809, or any other consumer financial law. The purpose of this investigation is also to determine whether Bureau action to obtain legal or equitable relief would be in the public interest.

69.     In response, the companies' Executive Meeting Deck for May 2, 2013 indicates that Think Finance was going to "restructure tribal" to "minimize legal risk," and launch RISE in an attempt to offset losses.

70.     The June 18, 2013 Board Memo demonstrates that Think Finance knew its business was doomed to fail, stating "if banks won't process the ACH payments, there is no business." Indeed, the NYDFS was investigating illegal online lending and had begun "Operation Chokepoint," and its ACH providers were also being ordered to cease and desist their related activities by federal regulators. As stated in a July 30, 2013 email from Lutes to Cutrona, "North American Bank, said the FDIC told them 'no' on tribal and the FDIC said the pressure was coming from the DOJ, FTC and CFPB." The bank gave Think Finance until August 31, 2013 to transfer the business elsewhere. In addition, the "FDIC said they would make their life hell if they didn't stop processing ACHs for the tribes."

71.     Despite the knowledge that the companies were engaging in illegal and improper activities and being instructed to cease and desist, and in a desperate attempt to avoid liability, Wong began taking an active role with the Otoe-Missouria tribe in its litigation in New York with the NYDFS as early as August 9, 2013, even though Think Finance was not a party. Wong helped select the tribe's counsel, was included in strategy sessions and decision making about the case, received confidential strategy materials and "White Papers" about sovereign immunity for tribes, provided comments on briefs, and attended oral arguments in Court.

72.     On August 9, 2013, Great Plains expressed its disappointment to Think Finance about the launch of the RISE product. Rees lied to the tribe and later bragged to Lutes and other

executives at Think Finance in an email stating that he told Great Plains that "the ACH issue didn't impact our marketing plans for Rise (*which is at least somewhat true*)." (Emphasis added).

73. On August 12, 2013, VPC sent a frightened email to Think Finance to show them that the public was now aware of the rent-a-tribe scheme. The email contained an article from *USA Today* about the New York litigation with the tribes and the prosecution of the Western Sky / CashCall scheme.

### III. Think Finance Decides to Focus on Growing RISE Due to the Regulatory Issues with Tribal Lending.

74. The August 14, 2013 Board Memo demonstrates that Think Finance shifted its focus to the RISE (legal, state licensed lending) product while looking for an emergency exit from the tribal business. Rees acknowledged that the efforts of federal and state regulators, including the FDIC, DOJ and NYDFS, to stop ACH processing created an unwinnable battle for the enterprise. Consequently, Rees and his cohorts increased their focus on RISE and suspended their marketing campaigns for tribal lending.

75. On August 16, 2013, an email was circulated to officers and directors at Think Finance which stated:

> "…. we can presume the NYDFS, DOJ, FDIC, FTC, CFPB, FinCen and perhaps other agencies are holding regularly scheduled conference calls and in-person sessions . . . to coordinate and revise their strategies to take this industry down."

76. By email dated August 21, 2013, VPC advised Lutes and Think Finance that it would cease funding GPLS and stop purchasing tribal loans by the end of the week. It also advised Think Finance by email dated September 5, 2013 that it decided to stop purchasing loans due to the NYDFS cease and desist order.

77.     The September 18, 2013 Board Memo advised the Board of Rees' acceptance of the end where he states: "Unfortunately, I don't think that we can hide in the shadows any longer."  He also thanked Wong for leading the litigation effort.

78.     On October 2, 2013, Think Finance and VPC exchanged emails which attached articles from the *Wall Street Journal, New York Times, Bloomberg, CNBC, Marketwatch, Washington Post, AP, Reuters, Consumer Affairs, ABC* and others about the NYDFS victory over the tribes in the New York Litigation.  This growing public storm was the proverbial nail in the coffin.

79.     Wells Fargo, the main corporate bank of Think Finance informed it that Wells Fargo could no longer provide basic services in any capacity.  All of the big four accounting firms also declined Think Finance as an audit client because of the litigation.

80.     The October 16, 2013 Board Memo notes that Think Finance will actually lose money in September, banks are skittish, and "the key for us, however, is to not negatively impact efforts that are critical to scale RISE . . ."

81.     By October 29, 2013, Rees and the executives of Think Finance sought and obtained a term sheet from VPC for a new loan facility for RISE in the amount of $250 million. By doing so, Think Finance switched its sole funding source for its tribal lending over to RISE, knowing they were leaving Think Finance to die on the vine.

82.     The November 13, 2013 Board Memo indicates that the tribal lending business continued to decline and had negative net income, while RISE was showing "amazing growth" and would hit over $50 million.

83.     Internal emails at Think Finance between November 18, 2013 and December 10, 2013 describe Think Finance's "transition out of tribal" and the "de-emphasizing of tribal given all the regulatory uncertainties."

### IV.     Think Finance Decides to Evade its Legacy Liabilities.

84.     With the remarkable growth of RISE, Think Finance decided it needed a clean break from its illegal tribal lending past to isolate and capture the growing windfall of profits RISE offered.  The December 11, 2013 Board Memo even states "It sure looks like we have a sure winner in Rise."  It further states:

> As mentioned during the previous Board meeting, we are evaluating a rather draconian organizational change that we are referring to as 'Project Exclaim.' This would spin off several products (Rise, Sunny, Elastic) to separate the tribal and non-tribal businesses . . .

Think Finance unequivocally decided to free its RISE business from the Legacy Liabilities.

85.     Michael Goguen, who sat on Think Finance's Board for Sequoia Capital, the second largest shareholder, summarized the strategy described to him by Think Finance in a "GetRealNews" communication to Sequoia personnel:

> On Friday, the [Think Finance] Board gave the go-ahead on 'Project Exclaim,' which will split the company into two pieces: Think Finance will continue to be the name for the company containing all of the (extremely profitable but) tainted assets, including all tribal lending products. These products will continue to generate significant cash, but no effort will be put into growth. The good stuff will be in the newco with a new name (currently Exclaim), and will contain only lending products with no grey area, eg Rise (which conforms strictly to state by state enabling legislation). While the investor ownership will be mirrored in each cap table, obviously our active participation and return prospects will be associated only with the new 'good' half.

86.     By email dated December 18, 2013, Rees advised the Board of the CFPB's action against CashCall/Western Sky for illegal online lending and states "it is a strong argument for proceeding down the path we are heading with [Project] Exclaim."

87. On December 23, 2013, Rob Rosette, Esquire of Rosette LLP emailed Wong a detailed strategy which included analyses of the CashCall case, CFPB CID's, New York litigation, and Class Action Cases.

88. Think Finance knew that the Legacy Liabilities, including the claims asserted by regulators and in impending class actions for the contingent liabilities arising from the scheme, would prevent the company from ever realizing Rees' dream of going public. The January 16, 2014 Board Memo states that "[w]e believe the non-tribal businesses can deliver over $500MM in revenue in 2015 and $75MM in EBITDA positioning us to potentially take that business public in 2015."

89. To make that dream come true, Think Finance had to cannibalize its businesses. It asked VPC to redirect its funding from purchasing loans through GPLS over to a credit facility for RISE.

**V.    Think Finance Devises a Scheme to Avoid Responsibility for the Legacy Liabilities.**

90. On February 2, 2014, Lutes emailed the public relations department to tell them "how to position the spin off with the CFPB" so as to "not appear that Think Finance is being financially diluted."

91. On February 7, 2014, Massachusetts sent a CID to VPC which states, "[t]his investigation relates to allegations that Victory Park Capital Advisors, LLC has engaged in unfair and deceptive practices involving payday loans in violation of M.G.L. c. 93A, §2(a) and M.G.L. c. 140 § 96." On or about February 21, 2014, the Bank of Montreal terminated its ACH services for Think Finance. These actions served as a pointed reminder that the company could never continue or go public saddled with the Legacy Liabilities. Accordingly, Think Finance put into

motion its plan to jettison the Legacy Liabilities and shield its valuable RISE Assets from the regulators and defrauded consumer borrowers.

92.     First, Think Finance isolated its Legacy Liabilities to achieve a clean break by creating a new entity, Elevate, that would be a legal, state licensed lending business.  Second, it severed the RISE business through a purported tax-free spin-off.  Third, Think Finance was used as a dividend play to distribute all remaining cash to its shareholders, the bulk of which went to insiders.

93.     Anticipating subsequent scrutiny by the regulators, and potential challenges to the actions of the officers and directors in undertaking the spin-off, Think Finance retained CBIZ to provide a "Valuation Analysis" for both Think Finance and Elevate and a "Solvency Opinion" for the Think Finance Board.  The analyses, however, were little more than window dressing. Think Finance knew the tribal lending business would be far too small after the spin-off to service the Legacy Liabilities, so it lied and concealed the magnitude of the Legacy Liabilities from CBIZ entirely.

94.     Although CBIZ was ostensibly retained to provide an objective valuation, Think Finance controlled the valuation process with an iron fist.  It provided the base case and tribal wind down models and select financial information to CBIZ, while precluding CBIZ from performing any investigation, audit or independent corroboration of the information.

95.     The complete lack of objectivity in the Valuation Analysis is shown through an email dated February 18, 2014, long before their work was completed, where CBIZ asks Think Finance to "check with counsel on the exact language they would like to see in the opinions and also the solvency tests they would like to see conducted."

96.     On February 19, 2014, Think Finance's Corporate Secretary, Paul Tauber, emailed Lutes the exact language certain insiders had drafted for inclusion in the CBIZ analysis:

"TF: Pre-Transaction:

1. TF is able to pay its debts and other obligations in a timely manner as they become due;

2. The capital of TF is a reasonable amount for the business in which it is engaged; and

3. The fair market value and present saleable value of TF's aggregate assets exceed TF's aggregate stated and contingent liabilities.

TF and Elevate: Post-Transaction (separate opinions)

1. TF/Elevate is able to pay its debts and other obligations in a timely manner as they become due;

2. The capital of TF/Elevate is a reasonable amount for the business in which it is engaged; and

3. The fair market value and present saleable value of TF/Elevate's aggregate assets exceed TF/Elevate's aggregate stated and contingent liabilities."

Lutes then forwarded this prescribed language to CBIZ by email.

97.     The Corporate Secretary even discussed the required content for these solvency opinions with counsel for one of Think Finance's largest shareholders, Technology Crossover Ventures ("**TCV**"). Lutes then emailed CBIZ on February 25, 2020, prior to CBIZ rendering even a draft opinion, demanding "there should be an opinion that Think as a solvent entity on the day of spinoff is distributing Elevate and Think is solvent post-spinoff."

98.     After cherry picking the financial information, concealing the contingent liabilities, and demanding a conclusion that both entities were at all relevant times solvent, Think Finance and Elevate, on or about February 25, 2020, then demanded that CBIZ amend the engagement letter to ensure the true nature of the Legacy Liabilities remained hidden, by including the following new language:

For the purposes of the Opinions: . . .

"identified contingent liabilities" shall mean the amount of contingent liabilities on a consolidated basis identified to us in writing and valued by responsible officers of such Entity, upon which CBIZ will rely without independent verification; no other contingent liabilities will be considered;

It also required CBIZ to *remove* the following from the engagement letter:

CBIZ reserves the right but has no obligation to make adjustments to the analyses, opinions and conclusions set forth in the Opinions as CBIZ deems necessary by consideration of additional or more reliable data that may be available.

Think Finance further demanded the insertion of a confidentiality provision.

99.     Lutes also routinely forced CBIZ to edit any drafts that were inconsistent with the desired outcome.  Presumably frustrated with the lack of transparency, CBIZ advised Think Finance on March 4, 2014 that it would not provide a "Will Opinion", it would not indemnify any party, and the opinion should not be relied on by anyone other than the officers and directors.

100.    CBIZ's analysis concluded:

> **Think Finance Base Case**
> - 2014 Revenue $194,461,862, then drops to $99,289,149 by 2018.
> - 2014 EBITDA $75,784,544, then drops to $27,234,169 by 2018.
> - 2014 Net Income $34,075,882, then drops to $3,650,261 by 2018.
> **Elevate Base Case**
> - 2014 Revenue $269,393,526 then increases to $1,050,860,371 by 2018.
> - 2014 EBITDA ($29,974,044), then increases to $199,792,780 by 2018.
> - 2014 Net Income ($30,424,053), then increases to $96,223,488 by 2018.
> **Fair Value Split:  30.847 % TF ($109,770,000) and 69.153% Elevate ($246,000,000).**

101.    CBIZ's inherently flawed conclusion that Think Finance would be solvent after the spin-off, however, was due to the fact that $0.00 was being allocated to the Legacy Liabilities.  The "Operational Assumptions" section indicates that CBIZ assumed that the

company had no undisclosed real or contingent liabilities outside of the ordinary course that would impact the analysis. The assumption was based on the false and clearly unreliable information knowingly provided to CBIZ by Think Finance. The opinion also failed to include or reflect the value of the intellectual property usurped by Elevate.

102.     Notably, on April 30, 2014, Lutes, Think Finance's CFO, signed and provided a Representation Letter to CBIZ which falsely warrants and represents that:

> information was provided to CBIZ . . . is true and correct . . . no change . . . in the . . . liabilities (contingent or otherwise) . . .

> The Company has no material . . . contingent liabilities that will affect CBIZ's analysis or the Opinion, including those arising from litigation, claims or assessments, other than those set forth on the Annex attached hereto [None]

> I have consulted with the general counsel and certain other officers of the Company as well as outside counsel . . . who have responsibility for legal . . . concerning pending and threatened litigation, and other contingent liabilities of the Company, or facts known to them which could give rise to litigation . . and have included on the Annex hereto (a) each and every such contingent liability, (b) our best judgment as to the maximum realistic exposure of each such contingent liability . . .

103.     The company intentionally lied and misled CBIZ to ensure the opinion would be favorable. Exposing the true intent, an internal email dated March 13, 2014 from Lutes to Badr Qureshi, the Vice President and Treasurer, admits:

> Rise is now our largest product and we expect to generate almost $300mm in revs this year off of non-tribal. The tribal litigation would hold up our ability to go public. Spinoff enables the new entity to go public and allows Think (tribal business) to turn into a dividend play.

Subsequent emails from Lutes to VPC dated March 18, 2014 disclose that Think Finance did not want it to be "saddled with too much excess cash" after the spin-off and the cash could be distributed as dividends.

104.     To cover up the true purpose of the spin-off, Think Finance even retained a public relations company to assist in the creation of a "Q&A" script to keep regulators, consumers, and

the press at bay. The Q&A falsely stated that: (i) the split would enhance the value of both companies; (ii) the CFPB and regulatory overhang were not factors which precipitated the spin-off; and (iii) Think Finance retains a very profitable business and has every reason to believe its growth will continue.

105. Think Finance also retained KPMG to provide an opinion as to whether the transaction qualifies as a tax-free spin-off so its shareholders could avoid paying taxes. The company needed KPMG's opinion to substantiate a tax-free spinoff, but the analysis and conclusion flies in the face of the CBIZ opinion. To qualify for tax-free treatment, Think Finance disclosed the Legacy Liabilities to KPMG because "exigent circumstances" and a "legitimate business purpose" are required for a spin-off to get tax-free treatment under §§ 355 and 368 of the IRS Code:

- As opposed to the CBIZ opinion which states that no contingent liabilities exist, the KPMG opinion thoroughly discusses the exigent contingent claims from the actions of the regulators. It states: "The Spin-Off is motivated, in whole or substantial part, by a corporate business purpose to eliminate the detrimental impacts on the Branded Products Business [RISE etc.] caused by the regulatory and litigation uncertainty emanating from the controversy between the Product Platform Business [Tribal] and certain federal and state litigators and regulators.";

- The KPMG opinion includes an analysis of the various actions brought by the FDIC and OCC, Operation Chokepoint, the loss of ACH in the tribal lending industry, and the CFPB investigation;

- The opinion also states that the business purpose of the transaction was a move to "insulate the Branded Products business from the regulatory overhang"; and

- But even here complete candor to KPMG was not feasible such that Think Finance's lies to KPMG are reflected in certain erroneous statements to the effect that: (i) officers and directors are to remain at Think Finance (which they did not); and (ii) there are no substantial interruptions in Think Finance's business (ignoring the critical loss of VPC funding).

106. In perhaps the biggest lie told during the scheme, on April 30, 2014, Lutes, in his capacity as CFO of Think Finance, sent CBIZ a confidential letter which stated:

. . . each of the following is true and correct:

. . . there has been no change or new facts, financial or otherwise, in the business, assets, liabilities (contingent or otherwise), financial condition . . . which could reasonably be expected to have a material adverse effect on the Opinion to be rendered by CBIZ . . .

The Company has no material commitments or contingent liabilities that will affect CBIZ's analysis or the Opinion, including those arising from litigation, claims, or assessments, other than those set forth on the Annex attached hereto. . .

I have consulted with the general counsel and certain officers of the Company as well as outside counsel, advisors, and consultants to the Company who have responsibility for legal, financial and accounting matters concerning pending and threatened litigation, and other contingent liabilities of the Company . . . or facts known to them which could give rise to litigation, asserted claims . . . and other contingent liabilities, and have included on the Annex attached hereto: (a) each and every such contingent liability, (b) our best judgment as to the maximum exposure of each contingent liability . . .

The "Annex" also showed: "Identified Contingent Liabilities None".

107. Lutes as CFO, Cutrona as General Counsel, Rees as CEO and Chairman of the Board, were collectively well aware of the illegal nature of the rent-a-tribe scheme, and the investigations, contingent claims, and litigation threatened by the CFPB, NYDFS, state attorneys general and consumer borrowers. They were also acutely aware of how similar investigations and prosecutions had developed with similar entities like AMG. Accordingly, this representation letter was a bald-faced lie intended to conceal the ensuing fraudulent transfer of assets to Elevate. Indeed, Rees also signed a May 1, 2014 Representation Letter for KPMG that stated:

. . . the Spin-Off is motivated, in whole or substantial part, . . . to eliminate the detrimental impacts on the Branded Products Business caused by the regulatory and litigation uncertainty emanating from the controversy between the Product Platform Business and certain federal and state litigators and regulators . . .

108.    In attempt to insulate themselves from liability for the fraudulent transfer, certain officers and directors brazenly executed Indemnification Agreements dated May 1, 2014 attempting to protect each of them for orchestrating the spin-off.  After being left out of the first round, Cutrona, Lutes, Wong, and Carrie Carbone (another in-house attorney) demanded to be indemnified after the spinoff, and they drafted and signed Indemnification Agreements on or about September 24, 2014, while back-dating their effective date to May 1, 2014, the day of the spin-off.

109.    The Debtors consummated the Transfers to Elevate for no consideration on or about May 1, 2014, and Think Finance was left insolvent due to the massive Legacy Liabilities (and payment of dividends which greatly benefitted the very same insiders).

110.    The first Board Memo following the Elevate spin-off shows that Think Finance's revenue decreased by $3.0 million, EBITDA decreased by $5.2 million, and net income decreased by $4.4 million.

111.    Displaying the depth of their desire to prevent being prosecuted and held liable, just six days after the spin-off on May 7, 2014, Cutrona emailed Rees, Jason Harvison, an Executive VP at Think Finance (who subsequently became and remains Elevate's current CEO), and others stating that the company should think about "putting on retainer certain law firms that might be interested in assisting states in these actions" in an attempt to create conflicts of interest that would prevent these law firms from participating as legal counsel in lawsuits against Think Finance and Elevate.

112.    A May 16, 2014 internal accounting memorandum admits that Think Finance received no consideration whatsoever from its shareholders in connection with the Elevate shares

they received, and that Think Finance received $0.00 from Elevate for the $246.0 million in assets transferred to Elevate as part of the scheme.

113.    On May 27, 2014, a mere 27 days after the spin-off, the United States District Court for the Central District of California granted the CFPB's petition to enforce its CIDs.

114.    Additional internal emails show that Think Finance knew all along that the transfer of hundreds of millions of dollars in assets was subject to a fraudulent transfer challenge:

    a.  An email on June 4, 2014 between Rees (Chairman of the Board of both companies at the time; former CEO of Think Finance and new CEO of Elevate), Lutes (CFO of both companies at the time), Drew (representative of TCV, the largest shareholder of both companies) and Wong (now CEO and shareholder of Think Finance) acknowledges that the wind down of Think Finance before five (5) years following the spin-off will affect the tax free nature of the spin-off for shareholders and may constitute a fraudulent transfer.

    b.  A June 6, 2014 email between Rees, Lutes and Wong notes that: (i) in the event there are successful lawsuits against Think Finance with respect to tribal lending seeking restitution and damages, the amount of liability will likely be commensurate with the volume of loans made; (ii) shareholders Stinson and Harvison (Elevate's current CEO) are in favor of a dividend strategy; and (iii) they really need to hammer home the point that they cannot wind down Think Finance because it will forfeit the tax free treatment, resulting in more than $30.0 million in tax liability.

    c.  On August 14, 2014, an email between Lutes and CBIZ provides insight into how Think Finance and Elevate intended to cover their fraudulent tracks when it states "I would hate to show a big jump in the valuation so quickly after a spinoff . . . gradually tweak the forecast to avoid having a large jump post-spinoff.  Maybe for the first go-around keep the forecast more similar to the spinoff analysis."

115.    On November 14, 2014, the Attorney General for the Commonwealth of Pennsylvania filed a Complaint against Think Finance and others.

### VI.    Think Finance Distributed its Remaining Cash to Shareholders to Keep it from the Creditors.

116.    In the face of the CFPB litigation and the now filed Pennsylvania lawsuit, and the attendant industry upheaval, Think Finance awarded bonuses and increased compensation to its

executives and then began to siphon off the remaining cash through the payment of dividends as the final step in the scheme.

117.    Despite having never paid dividends to its shareholders, Think Finance declared $59,914.232.98 in dividends over a 10-month period - on April 13, 2015, November 9, 2015, December 16, 2015, and February 2, 2016.  In its zeal to remove the cash from the reach of its creditors, Think Finance even failed to request or receive consent from VPC to make the first round of distributions.

118.    Consequently, even the cash that was left behind at GPLS, which could never begin to cover the billions of dollars in Legacy Liabilities, was then taken by the officers, directors and other shareholders who orchestrated the fraudulent transfer.

119.    Prior to distributing the cash in the form of dividends, Richard Scheff, Esquire[8] advised Lutes and Cutrona to conceal their intention to distribute the cash from the Attorney General for the Commonwealth of Pennsylvania because the Attorney General "will take the view that the funds being distributed could be used for a settlement or to pay a judgment."  In addition, Elevate and Rees had requested to be dismissed from the litigation, and Scheff warned that disclosure "would effectively cause any dialogue to dismiss Elevate and Rees to end." Without the knowledge of the impending distribution, and the financial benefit it could have offered certain consumer borrowers, the Attorney General agreed to dismiss Elevate.

120.    Consistent with the Debtors' expectations, on May 13, 2015, consumer borrowers in Vermont filed a putative class action against Think Finance.

121.    Think Finance not only received less than reasonably equivalent value as the result of the spin-off, Think Finance, and ultimately its creditors, received nothing at all.  Not a

---

[8] He was with Montgomery McCracken Walker & Rhoads LLP at the time, and now is with Armstrong Teasdale LLP.

single dollar or any other form of consideration was given by Elevate for the more than $246 million in valuable assets it received as part of the same scheme.

122. Based on the opinion received from CBIZ, Elevate received at least $246.0 million in assets from Think Finance and assumed none of the Legacy Liabilities.[9] Think Finance was left with the entirety of the Legacy Liabilities, totaling in excess of $1.13 billion, the costs and problems associated with the winddown of the illegal tribal loan portfolio valued at $78 million, and approximately $60 million in cash (which was immediately distributed in the form of dividends).

123. In short, Think Finance was left insolvent and severely undercapitalized, burdened with billions of dollars in Legacy Liabilities and an illegal business model, and no funding source. Think Finance was destined to fail to the direct detriment of its creditors. The key executives who concocted and implemented the fraudulent scheme - Rees, Lutes, Harvison, Cutrona and others – obviously reached the same conclusion when they left Think Finance and went to work with Elevate, the entity they created.

124. Less than 18 months after the spin-off, Elevate succeeded in its goal and filed an S-1. On April 6, 2017, Elevate completed an IPO. Many of the same executives and insiders who orchestrated the fraudulent scheme that financially decimated Think Finance pocketed millions in dividends from Think Finance, and then acquired stock in Elevate.

125. Elevate has acknowledged its potential liability for the fraudulent transfer exposure resulting from its attempt to avoid the Legacy Liabilities. Elevate's Form 10-K for fiscal year ended December 31, 2018 acknowledges that the spin-off could be challenged under federal and state fraudulent conveyance laws.

---

[9] CBIZ failed to include the valuable IP in the amount,

## VII. Think Finance Was Forced to File Chapter 11 when it Was Unable to Shoulder the Legacy Liabilities and Other Burdens.

126. While Elevate soared as a public company, Think Finance was forced to acknowledge the obvious consequences of the fraudulent scheme by filing Chapter 11 on October 23, 2017.

127. Think Finance was overwhelmed by the Legacy Liabilities. Since the spin-off, Think Finance essentially lost money month-after-month, and faced additional lawsuits by putative classes in Virginia, Florida, California, North Carolina and the CFPB on behalf of 17 states

128. Under the terms of the confirmed Plan, the defrauded consumer borrowers received an allowed $1.3 billion general unsecured claim.

## CLAIMS FOR RELIEF

### COUNT I
**Intentional Fraudulent Transfers under §§ 544(b) and 550 of the Bankruptcy Code and TUFTA § 24.005(a)(1) as to Present and Future Creditors[10]**

129. Plaintiff incorporates by this reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

130. The Transfers were made within four years prior to the Petition Date.

131. Think Finance has over a million unsecured creditors as to whom the Transfers are voidable under applicable law and who hold an unsecured claim allowable under 11 U.S.C. § 502 and TUFTA (including, but not limited to 24.005 and 24.006), including federal government entities, state government entities, tort claimants, consumer borrowers, and trade creditors. The creditors' claims against Think Finance arose before or within a reasonable time after the Transfers were made.

---

[10] V.T.C.A. Bus. & C. §§ 24.001 to 24.013 is being cited as "TUFTA".

132. Think Finance made the Transfers with the actual intent to hinder, delay or defraud its creditors and/or future creditors, including the consumer borrowers.

133. As a result of the Transfers, Think Finance and its creditors have been harmed.

134. As noted above, by virtue of the Transfers, Think Finance was divested of title to the RISE Assets (its most valuable assets), and consequently, the assets were placed out of the reach of its creditors.

135. The Transfers were made to or for the benefit of Elevate.

136. At the time the Transfers were made, Elevate's CEO, and Chairman of the Board, Rees, was also the Chairman of the Board of Think Finance and the third largest shareholder. Think Finance's CFO Lutes and General Counsel Cutrona also moved to employment at Elevate. As a result, the Transfers were made to insiders who were in a position to, and did in fact, control and dominate the Elevate spin-off from Think Finance.

137. Think Finance made the Transfers without receiving reasonably equivalent value in exchange for the assets transferred. Indeed, through its multi-step fraudulent scheme, Think Finance received $0.00 in consideration for the Transfers.

138. Think Finance was insolvent and/or became insolvent shortly after the Transfers were made.

139. The Transfers occurred shortly before and/or shortly after Think Finance incurred substantial debts.

140. Indeed, based on the amount of the loan portfolio, Think Finance had over a billion dollars of claims from federal and state regulators, and consumer borrowers, both before

May 1, 2014 and after. In addition, the tribal loan portfolio left behind at Think Finance was illegal, of little value, and was later voided under the Plan.[11]

141. Under 11 U.S.C. §§ 544(b), 550(a), and TUFTA (including but not limited to 24.005 and 24.008(a)(1) and (a)(3)(C)) and other applicable law, the Trustee is entitled to, and does now seek to, avoid the Transfers and to recover the property or value of the property transferred to Elevate, as actual damages for the benefit of the beneficiaries of the Trust, with all legal and allowed pre- and post-judgment interest.

142. Elevate's conduct as described herein was fraudulent, wanton, malicious or willful or undertaken with the subjective awareness of a risk of harm to others and in complete disregard of the rights of the Debtors' creditors. Accordingly, the Trustee seeks further relief in the form of exemplary or punitive damages in an amount in excess of all actual damages to be determined at trial.

### COUNT II
### Constructive Fraudulent Transfer under §§ 544(b) and 550 of the Bankruptcy Code and TUFTA § 24.005(a)(2) as to Present and Future Creditors

143. Plaintiff incorporates by this reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

144. The Transfers were made by the Debtors within four years prior to the Petition Date.

145. Think Finance has over a million unsecured creditors as to whom the Transfers are voidable under applicable law and who hold an unsecured claim allowable under 11 U.S.C. § 502, including federal government entities, state government entities, tort claimants, consumer

---

[11] Approximately $336,000,000 was voided and adjusted to $0.00.

borrowers, and trade creditors. The creditors' claims against Think Finance arose before or within a reasonable time after the Transfers were made.

146.    As a result of the Transfers, Think Finance and its creditors have been harmed.

147.    The Transfers were made by the Debtors to or for the benefit of Elevate.

148.    By virtue of the Transfers, Think Finance was divested of title to the RISE Assets (its most valuable assets), and consequently, the assets were placed out of the reach of its creditors.

149.    Think Finance received less than reasonably equivalent value in exchange for the Transfers to Elevate as it received $0.00, and Think Finance (i) was insolvent on the date that the Transfers were made or became insolvent as a result of the Transfers due to, among other things, the Legacy Liabilities; (ii) was engaged in a transaction for which any property remaining with Think Finance was unreasonably small capital; or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

150.    Indeed, based on the amount of the loan portfolio, Think Finance had over a billion dollars of claims from federal and state regulators, and consumer borrowers, both before May 1, 2014 and after. In addition, the tribal loan portfolio left behind at Think Finance was illegal, of little value, and was later voided under the Plan.

151.    At the time the Transfers were made by the Debtors, Elevate's CEO and Chairman of the Board, Rees, was also the Chairman of the Board of Think Finance and the third largest shareholder. Think Finance's CFO and General Counsel, Lutes and Cutrona respectively, also switched to Elevate. As a result, the Transfers were made to insiders who were in a position to, and did in fact, control and dominate, the Elevate spin-off from Think Finance.

152. Under 11 U.S.C. § 544(b) and § 550(a), TUFTA (including but not limited to 24.005 and 24.008(a)(1) and (a)(3)(C)), and other applicable law, the Trustee is entitled to, and does now seek to, avoid the Transfers and to recover the property or value of the property transferred to Elevate as actual damages for the benefit of the beneficiaries of the Trust, with all legal and allowed pre- and post-judgment interest.

**COUNT III**
**Constructive Fraudulent Transfers under §§ 544(b) and 550 of the Bankruptcy Code and TUFTA § 24.006(a) as to Present Creditors**

153. Plaintiff incorporates by this reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

154. The Transfers were made by the Debtors within four years prior to the Petition Date.

155. Think Finance has over a million unsecured creditors whose claims arose before the Transfers and as to whom the Transfers are voidable under applicable law and who hold an unsecured claim allowable under 11 U.S.C. § 502 and TUFTA, including federal government entities, state government entities, tort claimants and trade creditors.

156. The Transfers were made to or for the benefit of Elevate.

157. Think Finance made the Transfers without receiving reasonably equivalent value in exchange for the assets transferred, and Think Finance was engaged or was about to engage in a business or transaction for which the remaining assets of Think Finance were unreasonably small in relation to the business or transaction.

158. Think Finance was insolvent at the time of the Transfers or became insolvent as a result of the Transfers due to, among other things, the Legacy Liabilities.

159. At the time the Transfers were made, Think Finance intended to incur, or reasonably believed that Think Finance would incur, debts beyond its ability to pay as they became due.

160. Think Finance made the Transfers to insiders, while Think Finance was insolvent, and the insiders had reasonable cause to believe that Think Finance was insolvent.

161. Indeed, at the time the Transfers were made, Elevate's CEO, and Chairman of the Board, Rees, was also the Chairman of the Board of Think Finance and the third largest shareholder. Think Finance's CFO Lutes and General Counsel Cutrona also moved to employment at Elevate. As a result, the Transfers were made to insiders who were in a position to, and did in fact control and dominate, the Elevate spin-off from Think Finance. As a result, insiders were in a position to, and did in fact, control and dominate Think Finance.

162. As a result of the Transfers, Think Finance and its creditors have been harmed.

163. Under 11 U.S.C. § 544(b) and § 550(a), TUFTA (including but not limited to 24.006 and 24.008(a)(1) and (a)(3)(C)), and other applicable law, the Trustee is entitled to, and does now seek to, avoid the Transfers and to recover the property or value of the property transferred to Elevate as actual damages for the benefit of the beneficiaries of the Trust, with all legal and allowed pre- and post-judgment interest.

**JURY DEMAND**

164. The Trustee, on behalf of the Trust, the Debtors and their estates, demands a trial by jury on all issues so triable pursuant to Federal Rule of Bankruptcy Procedure 9015 and Federal Rule of Civil Procedure 38, all relevant provisions of the United States Constitution, and all laws governing such a right.

### PRAYER FOR RELIEF

**WHEREFORE**, the Hon. Russell F. Nelms (Ret.), as Litigation Trustee for The Think Finance Litigation Trust, prays for relief and final judgment as follows:

(i) avoidance of the Transfers and compensatory damages in favor of the Trustee and against Elevate Credit, Inc. for all damages sustained as a result of Defendant's wrongdoing, in an amount in excess of $246.0 million to be proven at trial, including all lawful interest thereon;

(ii) punitive and/or exemplary damages in favor of the Trustee and against Elevate Credit, Inc. where such damages are available consistent with the public policy supporting such damage awards;

(iii)  upon avoidance of the Transfers, such other relief as is available under Section 550 of the Bankruptcy Code against Elevate Credit, Inc. and any subsequent transferees of the Transfers to the fullest extent permitted under the Bankruptcy Code;

(iv) an additional award in favor of the Trustee and against Elevate Credit, Inc. for the reasonable costs and expenses incurred by the Trustee in this action, including attorneys' fees, expert fees and all other recoverable or taxable costs; and

 (v) such other and further relief, both general and special, at law and in equity, to which the Trustee may show himself to be justly entitled and as the Court may deem just and proper.

Dated: October 19, 2020

Respectfully submitted,

/s/ James W. Walker
James W. Walker (TX Bar No. 20709600)
Ian Ross Phillips (TX Bar No. 24091239)
**Cole Schotz P.C.**
901 Main Street, Suite 4120
Dallas, TX 75202
Tel.: 469-557-9390
Fax: 469-533-1587
jwalker@coleschotz.com

and

Gary H. Leibowitz (Admitted *pro hac vice*)
Irving E. Walker (Admitted *pro hac vice*)
H.C. Jones III (Admitted *pro hac vice*)
**Cole Schotz P.C.**
300 East Lombard Street, Suite 1450
Baltimore, MD 21202
Tel: 410-230-0660
Fax: 410-230-0667
gleibowitz@coleschotz.com

*Attorneys for the Hon. Russell F. Nelms (Ret.)*
*as Litigation Trustee for The Think Finance*
*Litigation Trust*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of October 2020, I caused a true and correct copy of the foregoing Amended Complaint to be served upon all parties that are registered to receive electronic service through the court's CM/ECF notice system in the above case.

/s/ James W. Walker
James W. Walker

B1040 (FORM 1040) (12/15)  AMENDED

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>THE HONORABLE RUSSELL F. NELMS (RET.), LITIGATION TRUSTEE FOR THE THINK FINANCE LITIGATION TRUST | **DEFENDANTS**<br>Elevate Credit, Inc. |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.) | **ATTORNEYS** (If Known) |
|---|---|
| James W. Walker (TX Bar No. 20709600)  Gary H. Leibowitz (Admitted pro hac vice)<br>Ian Ross Phillips (TX Bar No. 24091239)  Irving E. Walker (Admitted pro hac vice)<br>COLE SCHOTZ P.C.  H.C. Jones III (Admitted pro hac vice)<br>901 Main Street, Suite 4120  COLE SCHOTZ P.C.<br>Dallas, TX 75202  300 E. Lombard Street, Ste. 1450<br>469-557-9390 Telephone  Baltimore, MD 21202<br>410-230-0660 Telephone | Joel Reese<br>Pete Marketos<br>Reese Marketos LLP<br>750 N. Saint Paul St., Suite 600<br>Dallas, TX 75201<br>214-382-9810 Telephone |

| **PARTY** (Check One Box Only) | **PARTY** (Check One Box Only) |
|---|---|
| □ Debtor      □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    X Other  Litigation Trust/Plaintiff<br>□ Trustee | □ Debtor      □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    X Other  Defendant<br>□ Trustee |

| **CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br>Recover Transfers Pursuant To 11 U.S.C. §§ 544 And 550, And §§ 24.001 Et Seq. Of The Texas Uniform Fraudulent Transfer Act |
|---|

| **NATURE OF SUIT** |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
- □ 11-Recovery of money/property - §542 turnover of property
- □ 12-Recovery of money/property - §547 preference
- □ 13-Recovery of money/property - §548 fraudulent transfer
- X 14-Recovery of money/property - other 544 and 550

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- □ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- □ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- □ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- □ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- □ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- □ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- □ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- □ 61-Dischargeability - §523(a)(5), domestic support
- □ 68-Dischargeability - §523(a)(6), willful and malicious injury
- □ 63-Dischargeability - §523(a)(8), student loan
- □ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- □ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- □ 71-Injunctive relief – imposition of stay
- □ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- □ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- □ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- □ 01-Determination of removed claim or cause

**Other**
- □ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- □ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| X Check if a jury trial is demanded in complaint | Demand $  $246,000,000.00 |
| Other Relief Sought   Punitive Damages | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Think Finance, LLC, et al. | BANKRUPTCY CASE NO.<br>17-33964 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Harlin D. Hale |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br>Think Finance Litigation Trust | DEFENDANT<br>4H Investco LP, et al. | ADVERSARY<br>PROCEEDING NO.<br>19-03201 |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>   /s/ James W. Walker | | |
| DATE<br><br>   10/19/2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>   James W. Walker | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.